IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHUBB UNDERWRITING AGENCIES
LIMITED FOR AND ON BEHALF OF
SYNDICATE 2488; ALLIANZ
GLOBAL RISKS US
INSURANCE COMPANY; AND
XL SPECIALTY INSURANCE COMPANY,

       *Plaintiffs*,

v.                                  Case No. 1:17-cv-01095-JHR-KK

THE INSURERS SUBSCRIBING TO
AVIATION COMMERCIAL
GENERAL LIABILITY POLICY
NO. PL 003391673-13, BEING:
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA;
COMMERCE AND INDUSTRY
INSURANCE COMPANY; AND AIG
AEROSPACE INSURANCE SERVICES, INC.,

       *Defendants*.

## FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY JUDGMENT OR ALTERNATIVELY PETITION TO COMPEL ARBITRATION

Plaintiffs Chubb Underwriting Agencies Limited for and on behalf of Syndicate 2488,

Allianz Global Risks US Insurance Company, and XL Specialty Insurance Company (together

"Plaintiffs"), by and through their undersigned counsel, file this First Amended Complaint For

Damages And For Declaratory Judgment Or Alternatively Petition To Compel Arbitration

("Complaint") against the insurers subscribing to an insurance policy known as Aviation

Commercial General Liability Policy No. PL 003391673-13, being: National Union Fire Insurance

Company of Pittsburgh, PA, Commerce and Industry Insurance Company, and AIG Aerospace

Insurance Services, Inc., (together "Defendants") and in support thereof would respectfully show the following:

**PARTIES**

1.      Chubb Underwriting Agencies Limited for and on behalf of Syndicate 2488, is the lead insurer subscribing to the Chubb Policy.  It is incorporated under the laws of England and Wales with its principal place of business in London, England.

2.       Allianz Global Risks US Insurance Company is a subscribing insurer to the CHUBB policy.  It is incorporated under the laws of the State of Illinois, with its principal place of business in the State of Illinois.

3.       XL Specialty Insurance Company is a subscribing insurer to the CHUBB policy.  It is incorporated under the laws of the State of Delaware, with its principal place of business in the State of Connecticut.

4.      AIG and Commerce and Industry Insurance Company are also insurers subscribing to the CHUBB Policy, but have elected not to participate as plaintiffs in this action.

5.      On information and belief, the insurers subscribing to the National Union Policy are as follows:

        (a) National Union Fire Insurance Company of Pittsburgh, PA, a corporation  incorporated under the laws of Pennsylvania, with its principal place of business located at 175 Water Street, 18th Floor, New York, NY 10038.  National Union Fire Insurance Company of Pittsburgh, PA may be served with process at Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, PA 17110;

        (b)  Commerce and Industry Insurance Company, a corporation that is incorporated under the laws of New York, with its principal place of business at 175 Water Street, 18th Floor, New

2

York, NY 10038.  Commerce and Industry Insurance Company may be served with process at CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Dr, Ste 150N, Sacramento, CA 95833; and

(c)  AIG Aerospace Insurance Services, Inc., a corporation incorporated under the laws of Georgia, with its principal place of business located at 1200 Abernathy Road NE, Building 600, Atlanta, GA 30328.  AIG Aerospace Insurance Services, Inc. may be served with process at Corporation Service Company, 40 Technology Parkway South, Suite 300, Gwinnett, Norcross, GA, 30092, USA.

### JURISDICTION

6.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) or (3).  The Court has personal jurisdiction over the Defendants as Defendants entered into the Agreement at issue in the State of New Mexico.

### VENUE

7.      Venue is proper in Santa Fe, Santa Fe County, New Mexico under 28 U.S.C. § 1391(b)(2) because Santa Fe County is where the Agreement at issue in the present matter was made.

8.      Venue of the Arbitration Agreement is in Texas and Arbitration should go forward in either Houston or Dallas in accordance with that Agreement.

### NATURE OF THE CASE

9.      This Complaint arises from the refusal of Defendants to honor the terms of an agreement made with Plaintiffs to arbitrate the apportionment of liability between their respective insurance policies for money paid to settle certain claims arising out of an aircraft accident.

10.     Plaintiffs are insurers subscribing to an insurance policy known as Aviation Fueling, Defueling and Products Liability Policy No. AM1435751 (the "Chubb Policy").  Plaintiffs insured Southwest Aviation, Inc. ("Southwest"), a Phillips 66-branded fixed-based operator, in the underlying accident as described below.

11.     Defendants are insurers subscribing to an insurance policy known as Aviation Commercial General Liability Policy No. PL 003391673-13 (the "National Union Policy").  Defendants insured Ascent Aviation Group, LLC ("Ascent") and Phillips 66 in the underlying accident as described below.  A dispute exists as to whether Southwest is also covered by the National Union Policy, which is being arbitrated in a separate proceeding.

12.     On August 27, 2014, at approximately 6:34 p.m. MDT, a Cessna 421C, multi-engine airplane, N51RX, crashed shortly after receiving the incorrect fuel at Las Cruces International Airport in Southern New Mexico, killing the four individuals aboard (the "Accident").

13.     At the time of the Accident, Phillips 66 was in the business of manufacturing aviation fuel. Phillips 66 marketed and sold its Phillips 66-branded aviation fuel through its distributor and marketer, Ascent, to a network of more than 700 Phillips 66 branded fixed-base operators, including Southwest.  Immediately prior to the Accident, N51RX had been refueled at Southwest.

14.     At the time of the accident, as a Phillips 66 branded fixed-base operator, Southwest prominently displayed Phillips 66's trademarks on its buildings, fuel trucks, and uniforms, giving customers confidence they were dealing with a Phillips 66-approved aviation fueling operation.

15.     Phillips 66, in turn, marketed Southwest on its website, giving customers confidence that if they fueled at Southwest they were dealing with a Phillips-66 approved fueling operation, which, in turn, meant a safe fueling operation consistent with Phillips 66's 97-year history in connection

with the manufacture and sale of fuel, as well as the education of and monitoring of the quality and safety of its approved fueling operations.

16.     Clearly, Phillips 66 was responsible, and accepted responsibility, for ensuring that Southwest conducted its aviation fueling operations in a safe manner, and, Phillips 66 reportedly ensured the same by, among other things, representing that it conducted periodic inspections and training at each of its FBOs[1].  Phillips 66 was also bound by an Aviation Marketer Agreement with Ascent to provide inspection and training services to FBOs. If Phillips 66 and Ascent had performed the inspections as required they would have identified that Southwest's Jet-A Fuel truck was equipped with the incorrect fuel nozzle and corrected the action, preventing the Accident. Additionally, the Accident would have been avoided if Phillips 66 and/or Ascent had provided the training to Southwest's linemen as required in the Aviation Marketer Agreement. Phillips 66 also failed to provide Southwest with the appropriate equipment to ensure that correct fueling information was conveyed on the fuel receipts.  Finally, Phillips 66 and Ascent failed in their quality control and inspection of Southwest to make sure it complied with all standards/instructions and procedures.

---

[1] At all times relevant to this action, Phillips 66 has made representations to the public in connection with the "high" quality of its aviation fuels and branded FBOs.  For example, on its website, Phillips 66 wrote: "Ensuring that only the highest-quality fuels are pumped into an aircraft takes dedication and teamwork from the professionals at Phillips 66 and at every FBO in our network.  Pilots count on us for fuel that meets specifications every time . . . We conduct quality-control seminars at airports across the country throughout the year.  These classroom and ramp-training sessions allow for sharing knowledge and industry standards and are free of charge to Phillips 66 Aviation-branded dealers . . . Each Phillips 66 Aviation-Branded FBO is routinely inspected.  Our technical support personnel will help you ensure your facility is ready for business. Aviation involves calculated risks.  Pilots and aviation service dealers exercise judgment and make important decisions as a matter of course.  Part of being a professional in aviation means you know how to mitigate those risks.  As a Phillips 66-branded dealer, you will have an additional tool at your disposal.  Phillips 66 Aviation stands behind aviation dealers by providing $50 million excess liability insurance coverage.  This provides important supplemental coverage over and above your primary insurance policy, for certain risks associated with fueling-related incidents."

17.     Phillips 66 failed in its essential mission and was negligent because:

a.      The inspections under Phillips 66' responsibility, including those delegated to Apex, were so lax, infrequent, irregular, disorganized, poorly executed, poorly tracked, poorly enforced, and poorly coordinated with Ascent's inspection responsibilities that Phillips 66 failed to properly inspect, or ensure the proper inspection of Southwest facilities so that it could notify Southwest that its Jet-A fuel trucks were not equipped with the appropriate "duckbill" nozzles;

b.      Phillips 66 failed to train or to ensure the training of Southwest's line staff in the identifying and fueling of piston-engine aircraft such as N51RX;

c.      Phillips 66 failed to effectively communicate its safety standards and updates in safety practices to Southwest or even Ascent, regarding acceptable safe practices relating to the duckbill nozzle;

d.      Phillips 66 provided Southwest with defective fuel ticket and receipt-generation technology and systems, in that such systems did not contain appropriate cross-linking, safeguards, and redundancies to prevent the misfueling of aircraft and/or the generation of receipts and fueling slips which would accurately describe the fuel was inserted into the aircraft;

e.      Where Phillips 66 contractually delegated responsibility for training, inspections, and other safety practices regarding Southwest to third parties, including but not limited to Ascent, Phillips 66 failed to ensure that such third parties properly carried out their contractual responsibilities or even understood their contractual responsibilities; and

f.   Phillips 66 committed other acts of negligence contributing to the Accident to be further proven at trial in this matter.

18.   Ascent partnered with Phillips 66 as a distributor and marketer of Phillips 66 brand fuel and as such Ascent was responsible for selling and delivering Phillips 66 branded fuel to Southwest.  In the Aviation Marketer Agreement entered into between Ascent and Phillips 66, Ascent contracted to assist Phillips 66 in inspections, training, and communication of safety standards regarding Southwest.

19.   In its essential mission, Ascent failed, because:

a.   Ascent's inspection responsibilities were so lax, infrequent, irregular, disorganized, poorly executed, poorly tracked, poorly enforced, and poorly coordinated with Phillips 66' inspection responsibilities that Ascent failed to properly inspect, or ensure the proper inspection of Southwest facilities so that it could notify Southwest that its Jet-A fuel trucks were not equipped with the appropriate duckbill nozzles;

b.   Ascent failed properly to train or ensure the training of Southwest's line staff in the fueling and identification of aircraft such as N51RX;

c.   Ascent did not effectively communicate safety standards to Southwest or verify Southwest's understanding of the safety standards;

d.   On information and belief, Ascent participated in the provision and installation of Phillips 66' defective receipt-generation technology and systems as previously described; and

e.   Ascent also committed other acts of negligence contributing to the Accident to be further proven at trial in this matter.

20.    It is undisputed that on August 27, 2014, Phillips 66 and Ascent knew:

   a.    A Cessna 421C is a spark-ignited piston-engine aircraft;

   b.    A Cessna 421C requires AVGAS 100LL fuel, not Jet-A fuel;

   c.    That fueling a piston-engine aircraft such as a Cessna 421C with Jet-A fuel instead of AVGAS would cause a catastrophic engine failure.

21.    At all relevant times hereto, the employees of Phillips 66 and Ascent were acting within the scope of their employment or were acting as agents on behalf of Phillips 66 or Ascent.

22.    Phillips 66 and Ascent were negligent in their unreasonable failures to inspect Southwest's operations, train Southwest's employees, and communicate proper safety standards to Southwest; and, such negligence was a direct and proximate cause of the Accident.

23.    Phillips 66 and Ascent divided up responsibility for inspections of Southwest's operations, the training of Southwest's personnel, and related safety concerns through the Aviation Marketer Agreement.  Phillips 66 further contractually delegated responsibility for inspections to other third parties, including Apex Companies, LLC.  Southwest was an intended third party beneficiary of these contracts.

24.    Neither Phillips 66 nor Ascent enforced or adhered to their contractual obligations regarding training, inspections, and other safety concerns, as outlined in the Aviation Marketer Agreement and other relevant contracts.  As discussed above, this breach resulted in the Accident.

25.    In failing to adhere to their contractual obligations in the Aviation Marketer Agreement and other relevant contracts, Phillips 66 and Ascent breached their contractual duties to Southwest as a third party beneficiary by failing to properly perform their duties to provide inspections, training, and other safety-related benefits to Southwest.  As a result of the breach of Phillips 66

and Ascent of their duties to third-party beneficiary Southwest, Southwest suffered damages related to the Accident.

26.    The incorrect fuel slip and invoice were due to substandard invoicing and receipt generation software and equipment issued to Southwest by Phillips 66 that failed to incorporate anti-misfueling measures or even measures to ensure that the invoices and receipts reflected the type of fuel actually pumped.

27.    The receipt generating software and equipment was designed in a defective manner that was unreasonably dangerous, Phillips 66 and/or Ascent were engaged in distributing the equipment and software as a part of their fuel selling business, and the receipt generating software and equipment reached Southwest and Southwest's customers, including owners, operators, and those on board N51RX, in an unreasonably dangerous condition.

28.    The estates of the four individuals who were on board the aircraft (collectively the "Estates"), along with the aircraft owner, Elite Medical Air Transport LLC (hereinafter "Elite"), filed suits/interventions against numerous defendants.

29.    The various lawsuits were consolidated into a single case *In re: Air Crash of N51RX*, Cause Number D-101-CV-2015-00023 in the First Judicial District Court, County of Santa Fe, State of New Mexico (the "Litigation").

30.    Included as defendants in the Litigation were Phillips 66, Southwest, and Ascent (collectively the "Fueler Group").

31.    Each member of the Fueler Group sought coverage under the Chubb Policy and/or the National Union Policy for the claims asserted against it in the Litigation.

32.     During the course of the Litigation, the Plaintiffs, Defendants, and the parties to the Litigation participated in mediation in Santa Fe, New Mexico, which resulted in the settlement of the claims of three of the Estates (the "Summers, Chavez, and Martinez claims") and the claims asserted by Elite (collectively "the Settlements").  The claims of the fourth Estate were settled at a later mediation held in Houston, Texas.

33.     At the time the mediation sessions were conducted, and the Settlements were reached, unresolved issues existed as to the insurance coverage available to the members of the Fueler Group under the Chubb Policy and/or the National Union Policy, as well as the allocation of liability to each member of the Fueler Group with respect to the cause of the Accident.

34.     In order to achieve the Settlements and avoid a jury trial of the issues of liability and damages arising out of the Accident, the Plaintiffs and the Defendants agreed, through their respective representatives, and before the Settlements were reached, to jointly fund the amounts required to pay the Settlements, subject to subsequent binding arbitration between them to resolve the issues with respect to the insurance coverage available under the policies, and the allocation of liability for the Accident among and between the members of the Fueler Group (the "Agreement").

35.     Relying on the Agreement, Plaintiffs ultimately funded a disproportionately high percentage of the Settlements.[2]

36.     Plaintiffs knew at the time of the Agreement and discussed with Defendants that, due to the magnitude of negligence by Phillips 66 and Ascent contributing to the occurrence of the Accident as detailed above, the share of the liability attributable to Phillips 66 and Ascent is far greater than the percentage of the total liability they funded.  Plaintiffs allege and Defendants knew

---

[2] The terms of the group settlement are confidential and for that reason, the amounts paid by Plaintiffs and Defendants cannot be publically disclosed.

that Plaintiffs would never have agreed to fund such a disproportionately high proportion of the Settlements without the Agreement in place.

37.     On December 7, 2015, coverage counsel for the Defendants, who was present in the meeting when the Agreement was reached, sent an email to coverage counsel for the Plaintiffs setting forth the material terms of the parties' Agreement.  A true and correct copy of that email is attached hereto as Exhibit "A."

38.     Pursuant to, and in reliance on, the terms of the Agreement in Santa Fe and the subsequent written Agreement, the Plaintiffs and Defendants completed the Settlements. Pursuant to the funding portion of the Agreement, Plaintiffs, on a without prejudice basis, funded the majority of the money required to complete the Settlements.

39.     In February 2017, counsel for Plaintiffs contacted counsel for Defendants to initiate the arbitration required to allocate liability amongst the members of the Fueler Group pursuant to the Agreement.

40.     On April 24, 2017, Plaintiffs provided a draft arbitration agreement to Defendants based on the terms of the parties' Agreement as set forth in the December 7, 2015 email.

41.     That same day, counsel for Defendants provided a separate draft arbitration agreement in which Defendants sought to impose a new condition limiting their overall liability to be assessed in the binding arbitration process to the maximum sum of 20% (twenty percent) of the total amounts paid in the Settlements (the "Liability Cap").

42.     This Liability Cap was not previously discussed or agreed upon, by the parties, and was not part of the Agreement.

43.     When Plaintiffs objected to the inclusion of this new term in the Agreement, Defendants advised Plaintiffs that they would not participate in the agreed arbitration without the Liability Cap. A true and correct copy of the email from Defendants' counsel dated May 5, 2017, advising of Defendants' refusal to participate in the arbitration, is attached hereto as Exhibit "B."

44.     Plaintiffs allege that the Defendants have breached the Agreement by refusing to participate in the agreed arbitration unless Plaintiffs agree to the Liability Cap, which was not part of the parties' discussions, verbal agreement or the written Agreement.

45.      As Defendants have breached the Agreement, Plaintiffs sue under the theories of promissory estoppel, breach of contract, and breach of the duty of good faith and fair dealing for reliance damages because Plaintiffs paid the majority of the money needed to fund the Settlements based on the Defendants' promise of later arbitrating the coverage issues and the allocation of liability under the terms of the Agreement, without any limitation on the amount of Defendants' potential liability.

46.     In the alternative, Plaintiffs sue to compel arbitration according to the terms of the Agreement, which do not include the liability cap or any other limit on Defendants' potential liability.

### COUNT I - CAUSE OF ACTION IN PROMISSORY ESTOPPEL FOR DIRECT REIMBURSEMENT

47.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

48.     Plaintiffs assert a cause of action for promissory estoppel for the direct redistribution of the Settlement funds.

49.    Plaintiffs were induced to contribute the majority of the funds required to complete the Settlements by Defendants' promise to arbitrate the ultimate allocation of liability between the policies for the money paid to complete the Settlements in accordance with the terms of the Agreement.

50.    Plaintiffs reasonably relied on, and reasonably acted on, Defendants' promise by providing the majority of the funds required to pay the Settlements.

51.    Defendants knew or had reason to know that Plaintiffs were funding the Settlements based on Defendants' promise of the opportunity to recoup at least a portion of these funds through binding arbitration pursuant to the Agreement.  *See* Exhibit A.

52.    Defendants did not honor their agreement to arbitrate in accordance with the terms of the Agreement, and have instead refused to arbitrate unless Plaintiffs agree to the Liability Cap.

53.    Plaintiffs would not have entered into the Settlements, nor would Plaintiffs have funded the majority of the money needed to pay the Settlements, had they known that any future arbitration would be subject to the Liability Cap that the Defendants now seek to add to the Agreement.

54.    Therefore it is unjust for Plaintiffs to be denied the opportunity to recoup these funds through arbitration pursuant to the terms of the Agreement.

55.    Plaintiffs are entitled to an award of damages equal to the difference between what Plaintiffs actually contributed to fund the Settlements, and what Plaintiffs should have paid toward the Settlements based on their actual percentage of liability as would have been determined pursuant to the Agreement.

## COUNT II – BREACH OF CONTRACT

56.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

57.     Defendants have breached the written agreement by unilaterally requiring that Plaintiffs agree to limit, at arbitration, Defendants' liability in accordance with the Liability Cap.

58.     As a proximate result of Defendants' breach, Plaintiffs have been damaged.

59.     Plaintiffs are entitled to an award of damages equal to the difference between what Plaintiffs actually contributed to fund the Settlements, and what Plaintiffs should have paid toward the Settlements based on their actual percentage of liability as would have been determined pursuant to the Agreement.

## COUNT III – BREACH OF GOOD FAITH AND FAIR DEALING

60.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

61.     Defendants have acted in bad faith by refusing to arbitrate, without limitation, the allocation of liability between Plaintiffs and Defendants in accordance with the terms of the Agreement.

62.     Defendants have breached the duty of good faith and fair dealing.

63.     Plaintiffs are entitled to compensatory damages equal to the difference between what Plaintiffs actually contributed to fund the Settlements, and what Plaintiffs should have paid toward the Settlements based on their actual percentage of liability as would have been determined pursuant to the Agreement.

## COUNT IV – DECLARATORY JUDGMENT

64.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

65.     Under the Agreement, Plaintiffs contend that Defendants agreed that the parties' liability for contribution to the Settlements would be based on their respective percentages of liability, to be determined through binding arbitration pursuant to the terms of the Agreement.

66.     Defendants now contend that their percentage of liability for the Settlements should be limited in accordance with the Liability Cap.

67.     Plaintiffs deny this contention.

68.     There exists a controversy between the parties.

69.     Pursuant to the New Mexico Declaratory Judgment Act, § 44-6-1, et. seq., and/or 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the adjudication and determination of the parties percentage of liability is not subject to the Liability Cap and that Defendants are equitably estopped from asserting any such limitation on their liability in the binding arbitration agreed to be conducted under the Agreement.

### COUNT V- CAUSE OF ACTION TO COMPEL ARBITRATION BASED ON CONTRACT

### (Federal Arbitration Act, 9 U.S.C. § 4)

70.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

71.     In the alternative to seeking damages directly through promissory estoppel, as Defendants allege that there is "nothing further to discuss" and are refusing to arbitrate pursuant to the Agreement, Plaintiffs seek to compel arbitration under the Federal Arbitration Act ("FAA").

72.     The FAA mandates arbitration of claims that are subject to a written agreement and that affect interstate commerce.  Specifically, the FAA requires arbitration where (a) there is a valid, written arbitration agreement, and (b) a dispute is within the scope of the agreement.  Section 2 of the FAA provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2 (emphasis added). Section 4 of the FAA further provides that:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."

9 U.S.C. § 4.

73.    Pursuant to the Agreement, Plaintiffs and Defendants agreed to arbitrate the allocation of liability in Texas.

74.    The Agreement did not contain the Liability Cap.

75.    Accordingly, Defendants are bound by the Agreement, specifically the arbitration clause, which calls for arbitration in Texas and does not include the Liability Cap or any other limitation on Defendants' potential liability.

76.    The Agreement constitutes a "contract evidencing a transaction involving commerce" within the meaning of 9 U.S.C. § 2. Under Section 2, "the word 'involving', like 'affecting,' signals an intent to exercise Congress' commerce power to the full." *THI of New Mexico at Hobbs Center, LLC v. Spradlin*, 893 F. Supp. 2d 1172 (D.N.M. 2012). "The reach of the FAA thus extends to transactions in individual cases without showing any specific effect upon interstate

commerce if in the aggregate the economic activity in question would represent a general practice subject to federal control." *Citizens Bank. Alafabco Inc.*, 539 U.S. 52, 56-57 (2003).

77.     The Agreement involves interstate commerce as it contemplates contributions from multi-state and multi-national insurance companies and includes multiple terms for the arbitration of commercial insurance policies.

78.     Along with agreeing to arbitrate the liability among the members of the Fueler Group, the parties also agreed in the Agreement  to arbitrate "(1) whether the Phillips Excess Policy provides coverage for Ascent for the subject claims, in which case the two policies share excess coverage for Ascent; (2) whether the National Union Policy is excess over the Phillips Excess Policy with respect to the Elite claims; and (3) whether Southwest is entitled to coverage under the Fuel Dealer Excess Program contained in Endorsement 7 to the National Union Policy."  Exhibit A.

79.     Finally, the Agreement involves interstate commerce as the parties agree to arbitrate the allocation of liability in Texas, and the coverage issues in New York.

80.     Therefore, these activities, in the aggregate, affect and involve interstate commerce, thus subjecting the arbitration clause to the FAA.

81.     Plaintiffs have no plain, adequate, and immediate remedy at law for Defendants' refusal to arbitrate the allocation of liability in accordance with the terms of the Agreement, and Defendants' resulting breach of the Agreement.   Accordingly, Plaintiffs are entitled to an order compelling Defendants to proceed to arbitration in accordance with their Agreement.

### COUNT VI - CAUSE OF ACTION IN PROMISSORY ESTOPPEL TO COMPEL ARBITRATION

### (Federal Arbitration Act, 9 U.S.C. § 4)

82.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

83.     Plaintiffs assert a cause of action for promissory estoppel to compel arbitration.

84.    Plaintiffs were induced to contribute the majority of the funds required to complete the Settlements by Defendants' promise to arbitrate the ultimate allocation of liability between the policies for the money paid to complete the Settlements in accordance with the terms of the Agreement.

85.    Plaintiffs reasonably relied on, and reasonably acted on, Defendants' promise by providing the majority of the funds required to pay the Settlements.

86.    Defendants knew or had reason to know that Plaintiffs were contributing to fund the Settlements based on Defendants' promise of the opportunity to recoup at least a portion of these funds through binding arbitration pursuant to the Agreement. *See* Exhibit A.

87.    Defendants have refused to honor their agreement to arbitrate in accordance with the terms of the Agreement, and have instead refused to arbitrate unless Plaintiffs agree to the Liability Cap.

88.    Plaintiffs would not have entered into the Settlements, nor would Plaintiffs have funded the majority of the money needed to pay the Settlements, had they known that any future arbitration would be subject to the Liability Cap that the Defendants now seek to add to the Agreement.

89.    Therefore it is unjust for Plaintiffs to be denied the opportunity to recoup these funds through binding arbitration pursuant to the terms of the Agreement.

90.    Plaintiffs have no plain, adequate, and immediate remedy at law for Defendants' refusal to arbitrate the allocation of liability in accordance with the Agreement.  Accordingly, Plaintiffs are entitled to an order compelling Defendants to proceed to arbitration in accordance with the Agreement.

### PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court enter judgment in favor of Plaintiffs and against Defendants as follows:

a.  A judgment against Defendants for Plaintiffs' damages as a result of the breach as previously alleged , plus pre-judgment and post-judgment interest, costs, and all other relief to which Plaintiffs are entitled at law or in equity;

b.  In the alternative, an order compelling Defendants to participate in  binding arbitration in accordance with the Agreement, with no limit on Defendants' potential liability.

c.  All other relief to which Plaintiffs are entitled at law or in equity.

Respectfully Submitted:

SOMMER, UDALL, HARDWICK & JONES, P.A.

By:   */s/ Eric Sommer*
  Eric Sommer
  P.O. Box 1984
  Santa Fe, NM 87504-1984
  T: (505) 982-4676
  F: (505) 988-7029
  E: ems@sommerudall.com

STEPP & SULLIVAN, P.C.

*/s/ Jad J. Stepp*
Jad J. Stepp
Dennis J. Sullivan
5300 Memorial Dr., #620
Houston, Texas 77007
Telephone: (713) 336-7200
Facsimile: (713) 336-7205
E-mail: jstepp@ss-pc.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December, 2017, I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means as more fully reflected on the Notice of Electronic Filing.


By:    */s/ Eric Sommer*
                 Eric Sommer